JOURNAL ENTRY AND OPINION
Plaintiffs-appellants John M. and Sophie Donelan appeal from the summary judgment entered in the trial court in favor of defendants-appellees KeyBank (formerly Society National Bank) and Key Mortgage Services, Inc. arising out of plaintiffs' claim that the defendants breached their duties in administering a construction loan account set up for the plaintiffs' new home. Plaintiffs claim that disputed issues of material fact precluded summary judgment. We disagree and affirm the result below.
On April 10, 1995, plaintiffs entered into a Purchase Agreement with Ascension Builders for the construction of a new home at 6388 Glenwillow Drive, North Royalton. The Purchase Agreement called for a purchase price of $171,571 on which plaintiffs made down payments to Ascension Builders totaling $20,000. Plaintiffs sought financing from KeyBank, to wit: $90,000 in the form of a mortgage loan for which plaintiffs made application. The loan application was approved on July 28, 1995, and a $90,000 open-end mortgage in favor of KeyBank was recorded on August 9, 1995.
On August 9, 1995, the plaintiffs, as borrowers and KeyBank as the lender, entered into a Building Loan Agreement pursuant to which construction funds would be disbursed to the builder on requested draws as the percentage completion of the new home proceeded. Six months was allotted to complete construction. In addition to the $90,000 mortgage loan, plaintiffs agreed to deposit $61,571 with Key Bank (¶ 2m) to make up the balance of the purchase price (less the down payment) of $151,571.
The Building Loan Agreement contained the following relevant provisions regarding the disbursement of funds:
 3. All funds deposited in the Borrower's construction loan account, if any, and the proceeds of the Loan shall be disbursed as follows:
* * *
 (b) To pay to or for the account of the Borrower, as requested in writing by the Borrower and/or the Contractor from time to time, the costs theretofore incurred in the construction of said Improvements, at the time of such request, provided that the Lender shall not be obligated to make any advance of "Construction Funds," as hereinafter defined, if at the time of the request therefor, or as a result of the making thereof, the total amount of said Construction Funds advanced is or thereby would be greater than ninety per centum (90%) of the product of the Construction Funds and the "Loanable Percentage of Completion," as hereinafter defined.
 "Construction Funds" shall mean the sum of the Loan and the amount specified in paragraph (2)(m) hereof to be deposited with Lender by Borrower.
 "Loanable Percentage of Completion" shall mean the percentage of completion of said Improvements as determined in accordance with generally accepted construction accounting practices. Any disbursements made by Lender in reliance upon the statement of such costs set forth in any such written request shall be deemed in strict accordance with this Agreement and Lender shall incur no liability as a result of any such disbursements, notwithstanding any inaccuracies, errors or falsifications in any such request;
* * *
 The Lender is hereby authorized to disburse or cause to be disbursed the proceeds of the Construction Funds from time to time as work progresses to a construction loan account established in the name of the Borrower with Lender but Lender is not obligated to do so. The Lender is further authorized to make disbursements directly to the Contractor, any subcontractor or materialmen for labor or materials or to any other person for the purpose of paying any obligation of the Borrower hereunder, but Lender is not obligated to so disburse.
* * *
 6. The obligation of the Lender to make any disbursement pursuant hereto shall be subject to the following additional conditions:
 (a) The Lender shall not be obligated to advance any funds if the amount of such advance plus the balance of the Construction Funds shall not be sufficient in the opinion of the supervising architect or of Lender to complete the Improvements free and clear of all liens and encumbrances in accordance with the Specifications, and payment of all costs in addition to the amount provided under contract between the Contractor and the Borrower, nor shall the Lender be required to disburse any Loan proceeds if the amount of such disbursement plus all prior disbursements of the Loan shall exceed 90% of the product obtained by multiplying the total cost of the project by the percentage of completion certified by the Lender.
 (b) Prior to disbursement of loan proceeds for foundation work and thereafter, Lender, if the Lender so requires, shall have received a satisfactory survey showing in place Improvements to be in compliance with restrictions of record and required setback lines.
 7. The Lender does not assume and is hereby expressly released and discharged from any and all liability and responsibility whatsoever, which might or could arise out of the disbursement of the Loan or as to the method, manner or application of such disbursement, or as to mechanic's or materialmen's liens, or any other liens whatsoever which might attach to or be filed against the aforesaid Premises.
* * *
 9. The Lender assumes no responsibility for the completion of the Improvements according to the Specifications; in the event that the proceeds of the Loan together with the funds, if any, deposited hereunder by the Borrower, are found to be insufficient to erect or complete the Improvements in accordance with the Specifications and any agreed extras, the Borrower shall place and hereby agrees to place such additional funds in a construction loan account with the Lender.
In September 1995, construction began upon the home. Pursuant to the Purchase Agreement between the builder and plaintiffs, the builder was to draw upon the construction loan fund as follows: (1) at least 12% upon completion of the basement structure; (2) 55% upon delivery of the modular components; (3) 13% upon completion of the site work; (4) 10% shall be held as a "completion hold back" until acceptance of the property.
On September 19, 1995, the builder submitted his first draw request upon the construction loan fund in the amount of $92,458.31. The borrowers, John and Sophie Donelan, endorsed this request by their signatures. The builder, by affidavit, affirmed that all amounts were paid and that no liens were present. An appraiser, Joseph A. Pawlitsch, an employee of defendants, made an inspection, dated September 19, 1995, to determine the amount of work completed and "ok'd" a 15.5% draw be paid. His report indicated that one-half of the modular portion of the home was on the foundation and the other half was being prepared for emplacement. On September 21, 1995, defendants paid the builder the requested draw in the amount of $92,458.31 by internal wire transfer from the construction loan account to the builder's KeyBank account.
An inspection report, dated October 31, 1995, determined that 70.5% of the work was completed. On or about October 27, 1995, the escrow and title agent, Approved Statewide Title Service, endorsed that no mechanics liens were in place upon the property.
On November 6, 1995, the builder submitted his second draw request upon the construction loan fund in the amount of $24,000. The draw was again endorsed by the Donelans' signatures. The builder affirmed in an affidavit that all amounts were paid and that no liens were present. On November 9, 1995, the defendants paid the builder $24,000 by internal wire transfer to the builder's account.
On December 11, 1995, the builder submitted his third and final draw request upon the construction loan fund in the amount of $28,353.25. The builder again affirmed in an affidavit that all amounts were paid and that no liens were present. The Donelans' signatures again endorsed the request. According to the inspection report dated December 11, 1995, the work was 86% completed. On December 11, 1995, defendants paid the builder $28,353.25 by wire transfer to the builder's KeyBank account.
Plaintiffs contend that according to the Building Loan Agreement, there was supposed to be a hold back of 10% or $17,157.10. However, at this point, defendants had paid the builder $144,811.56 or 96% of the construction funds. Therefore, defendants held only 4% or $6,862.84 for the "hold back" which was to be used to ensure completion of the project and satisfaction of any outstanding work.
On April 19, 1996, defendants notified the builder that the plaintiffs were dissatisfied with the amount of time the construction was taking. On April 22, 1996, the builder informed defendants that the project would be 100% complete no later than "two weeks from today," or May 3, 1996.
On July 26, 1996, plaintiffs' attorney discussed the project with the builder and gave a final opportunity to complete performance.
On July 29, 1996, defendants' appraiser, Joseph A. Pawlitsch, informed defendants by letter that the plaintiffs had been experiencing difficulties with the builder and no longer authorized the disbursement of funds to the builder. This report reflects that the project completion was 92%, that no further money should be disbursed to the builder, and records the appraiser's conclusion that "less than average workmanship" occurred on the job.
On July 31, 1995, the escrow and title agent certified that no mechanics liens were in place.
On August 9, 1996, plaintiffs' attorney notified defendants by letter that the builder had breached its agreement and the Donelons' terminated the contract. The Donelons at this time also expressed their desire to hire a new contractor to complete the project.
All efforts by both the plaintiffs and defendants to contact the builder failed. On July 31, 1996, the escrow and title agent, Approved Statewide Title Service, endorsed that no mechanics liens were in place upon the property. However, on November 1, 1996, an Affidavit of Mechanic's Lien in the amount of $2,371 was filed by American Masonry, Inc. upon the property as a result of the builder not paying this contractor. On October 2, 1996, the builder filed for Chapter 11 protection under the Bankruptcy Act.
Plaintiffs filed suit on January 12, 1998, against KeyBank and Key Mortgage Services, Inc. alleging breach of contract, breach of implied contract, negligence, conversion, breach of promise, statutory liability and breach of fiduciary duty, all out of the alleged defective performance under the Building Loan Agreement. The main thrust of plaintiffs' claims was that KeyBank disbursed monies in excess of the amount they authorized. The trial court granted summary judgment for defendants on their motion without an opinion or explanation. This timely appeal ensued.
Plaintiffs' sole assignment of error states as follows:
 I. THE TRIAL COURT ERRED IN GRANTING THE DEFENDANTS/APPELLEES' MOTION FOR SUMMARY JUDGMENT WHERE THE MOTION WAS NOT ACCOMPANIED BY SUFFICIENT EVIDENTIARY MATERIALS TO ESTABLISH AS A MATTER OF LAW THAT NO GENUINE ISSUES OF MATERIAL FACT EXISTED AND PLAINTIFFS/APPELLANTS SUBMITTED SUFFICIENT EVIDENTIARY MATERIALS TO DEMONSTRATE THAT GENUINE ISSUES OF MATERIAL FACT REMAINED TO BE DISCOVERED AND RESOLVED BY THE TRIER OF FACT.
Appellate review of summary judgments is de novo. Grafton v.Ohio Edison Co. (1996), 77 Ohio St.3d 102, 105; Zemcik v. La PineTruck Sales Equipment (1998), 124 Ohio App.3d 581, 585. The Ohio Supreme Court recently restated the appropriate test inZivich v. Mentor Soccer Club (1998), 82 Ohio St.3d 367, 369-70 as follows:
 Pursuant to Civ.R. 56, summary judgment is appropriate when (1) there is no genuine issue of material fact, (2) the moving party is entitled to judgment as a matter of law, and (3) reasonable minds can come to but one conclusion and that conclusion is adverse to the nonmoving party, said party being entitled to have the evidence construed most strongly in his favor. Horton v. Harwick Chem. Corp. (1995), 73 Ohio St.3d 679, 653 N.E.2d 1196, paragraph three of the syllabus. The party moving for summary judgment bears the burden of showing that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Dresher v. Burt
(1996), 75 Ohio St.3d 280, 292-293, 662 N.E.2d 264, 273-274.
Once the moving party satisfies its burden, the nonmoving party "may not rest upon the mere allegations or denials of the party's pleadings, but the party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Civ.R. 56(E). Mootispaw v.Eckstein (1996). 76 Ohio St.3d 383, 385. Doubts must be resolved in favor of the nonmoving party. Murphy v. Reynoldsburg (1992),65 Ohio St.3d 356, 358-59.
Plaintiffs' principal contentions on appeal are that material issues of fact preclude summary judgment on whether defendants breached the Building Loan Agreement by overpaying the builder for work actually completed; by failing to preserve a 10% hold back fund; and refusing to distribute the funds held back to plaintiffs on demand. (Aplts' Brf. at p. iv). We find these contentions are not supported by the record.
"If a contract is clear and unambiguous, then its interpretation is a matter of law and there is no issue of fact to be determined." Davis, et al. v. Loopco Industries, Inc.
(1993), 66 Ohio St.3d 64, 66. The terms of the loan agreement clearly provided that KeyBank was authorized to disburse funds from the account upon written request from the borrowers and/or the contractor and that it was not obligated to make payments which exceeded the percentage of completion. The Building Loan Agreement (¶ 3(b)) specifically states:
 All funds deposited in the Borrower's construction loan account, if any, and the proceeds of the Loan shall be disbursed as follows:
 (b) To pay to or for the account of the Borrower, as requested in writing by the Borrower and/or the Contractor from time to time, the costs theretofore incurred in the construction of said improvements, at the time of such request, provided that the Lender shall not be obligated to make any advance of "Construction Funds," as hereinafter defined, if at the time of the request therefor, or as a result of the making thereof, the total amount of the Construction Funds advanced is or thereby would be greater than ninety per centum (90%) of the product of the Construction Funds and the "Loanable Percentage of Completion," as hereinafter defined.
The evidence attached to plaintiffs' motion for summary judgment indicated that KeyBank disbursed funds to the builder in amounts that exceeded the percentage of work completed at that time. However, nothing in the Building Loan Agreement, as stated above, obligated the Bank to adhere to the percentage of completion for payment. The Agreement merely states that the Bank was not "obligated" to pay amounts that "would be greater than * * * the `Loanable Percentage of Completion.'" [Building Loan Agreement ¶ 3(b)]. Therefore, KeyBank's payments in excess of the amount of completion was not a breach of that Agreement as KeyBank was authorized to make a disbursement upon written request from either the borrowers or contractor and had no affirmative duty to adhere to the percentage of completion in making such disbursements. Furthermore, the undisputed evidence clearly indicated that the plaintiffs' themselves authorized the draws as shown by their signatures on each and every request for payment form.
Also, at the time these disbursements were made, the builder was authorized to receive such payments. It was not until July 1996 that plaintiffs withdrew KeyBank's authority to make further payments to the builder. KeyBank made no further disbursements after this authority was withdrawn.
Since the payments that were made were authorized and were within the terms of the agreement, there is no breach of contract as a result of KeyBank making payments which did not correlate to the percentage of work completed.
Regarding KeyBank's failure to maintain a 10% hold back amount, again, nothing in the Building Loan Agreement obligated KeyBank to retain such an amount. The plain reading of the Agreement indicates only that KeyBank had the authority to decline to disburse any amount that exceeded 90% of the construction funds. See Building Loan Agreement at ¶ 3(b). Therefore, KeyBank only had the authority to decline such a disbursement; it did not have an affirmative obligation to decline such a disbursement. Furthermore, as stated above, the evidence indicates that the plaintiffs signed off on each such disbursement as their signatures appear on the draw request documents.
Although we note the purchase agreement between the plaintiffs and the builder sets forth the percentage of payments for each draw and the 10% hold back requirement, this was not incorporated into the Building Loan Agreement that plaintiff had with KeyBank. The contract between the plaintiffs and builder was exclusively between the builder and the plaintiffs. KeyBank's Building Loan Agreement with the plaintiffs explicitly states at ¶ 11:
 This Agreement, together with the Note and Mortgage and the application for said Loan, constitute the entire agreement between the Borrower and the Lender and no representations or agreements, express or implied, have been made to or with the Borrower not herein or therein contained. This Agreement shall not be amended or modified, nor may any of its terms or conditions be waived, except by an instrument in writing executed in the name of and on behalf of the Lender by one of its officers thereunto duly authorized. In the event of any conflict between this Agreement and any contract or agreement entered into between the Borrower and Contractor with respect to the construction of the Improvements, this Agreement shall govern and be controlling.
No change to this Building Loan Agreement occurred via a writing executed by a KeyBank officer and we find that the documents that the plaintiffs attached to their motion for summary judgment in an effort to show KeyBank did have an affirmative duty to pay pursuant to the schedule did not operate to change the terms of the Building Loan Agreement. Therefore, in enforcing the obligations of KeyBank, the Building Loan Agreement is the only document which governs since it is a clear and unambiguous integrated document. Nichols v. Chicago Title Ins.Co. (1995), 107 Ohio App.3d 684, 695 ("Since no obligation to notify plaintiffs of changes in the draw requests was contained in the loan agreement between the parties, and this was an integrated document fixing the respective obligations, the parol evidence rule excludes Mr. Nichols' unsupported "opinion" from consideration")
Even if KeyBank had an obligation to disburse funds according to the agreement reached between the builder and the plaintiffs, the evidence indicates that KeyBank never paid the builder more than the plaintiffs authorized as the plaintiffs signed off on each of the builder's draw requests. See Nichols v. Chicago TitleIns. Co., supra ("Mr. Nichols admitted that he approved of every dollar paid to Herbert. He even `reluctantly' approved the last payment to Herbert, admitting that he told no one of his reluctance. Under these circumstances, the trial court did not err in granting summary judgment on plaintiffs' contract claims")
In addition, the provisions of the Building Loan Agreement released KeyBank from all liabilities arising out of the method of disbursement of the loan funds. Paragraph 7 of the Building Loan Agreement states:
 The Lender does not assume and is hereby expressly released and discharged from any and all liability and responsibility whatsoever, which might or could arise out of the disbursement of the Loan or as to the method, manner or application for such disbursement, or as to mechanic's or materialmen's liens, or any other liens whatsoever which might attach to or be filed against the aforesaid premises.
Also, ¶ 3(b) states, regarding disbursements made pursuant to the "Loanable Percentage of Completion" that "Any disbursements made by Lender in reliance upon the statement of such costs set forth in any such written request shall be deemed in strict accordance with this Agreement and Lender shall incur no liability as a result of any such disbursements, notwithstanding any inaccuracies, errors or falsifications in any such request." Therefore, these sections operate to release and discharge KeyBank from any liability arising out of the disbursement of the loan.
Based on our conclusion that the Bank clearly abided by the terms of the Building Loan Agreement in making disbursements to the Builder and that such payments were authorized, we find the trial court did not err in entering summary judgment on the plaintiffs' breach of contract, negligence and conversion claims.
Plaintiffs also assert that KeyBank owed them a fiduciary duty, which it violated. A fiduciary relationship is one in which special confidence and trust is reposed in the integrity and fidelity of another and there is a resulting position of superiority or influence acquired by virtue of this special trust. In re Termination of Employment (1974), 40 Ohio St.2d 107,115. It is well settled that, as here, the relationship of a creditor and its debtor, is governed by the principles of contract, and is not a fiduciary relationship. Umbaugh Pole Co.v. Scott (1979), 58 Ohio St.2d 282.
 The relationship of debtor and creditor without more is not a fiduciary relationship. A fiduciary relationship may be created out of an informal relationship, but this is done only when both parties understand that a special trust or confidence has been reported.
Id. at syllabus. See, also, Blon v. Bank One, Akron, N.A. (1988),35 Ohio St.3d 98. These cases were followed by this Court inNichols v. Chicago Title Ins. Co. (1995), 107 Ohio App.3d 684,698-99.
In the instant case, the relationship between plaintiffs and KeyBank is simply one of debtor and creditor. KeyBank offered no advice to plaintiffs as to which builder to hire or which property to purchase. Its role of financing the construction was consistent with its status as a creditor/lender and the plaintiffs were debtors/borrowers. We find that no fiduciary relationship existed at any time between KeyBank and plaintiffs.
We cannot consider plaintiffs' arguments regarding KeyBank's alleged refusal to return plaintiffs' funds remaining in the account after their contract with the builder was terminated and regarding KeyBank's alleged refusal to allow plaintiffs to refinance their loan. Plaintiffs raised these claims in an amended complaint attached to their motion to amend. The plaintiffs' motion to amend, however, was denied and plaintiffs have failed to appeal the denial. We, therefore, have no jurisdiction to review these arguments, as the trial court did not consider them. Parks v. Baltimore Ohio R.R. (1991),77 Ohio App.3d 426, 428-429.
Plaintiffs' sole assignment of error is overruled.
Judgment: AFFIRMED
It is ordered that appellees recover of appellants their costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Court of Common Pleas to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
KARPINSKI, P.J., and BLACKMON, J., CONCUR.
 ________________________ JAMES M. PORTER, JUDGE.